The State v. Terry.

## The State v. Terry, *Appellant.*

### IN BANC.

1. **Criminal Pleading:** FRAUDS: FALSE REPRESENTATIONS: STATUTE: CONSTITUTION. The form of indictment prescribed by Revised Statutes, 1889, section 3826, relating to cheats, frauds, false representations, etc., is unconstitutional, in that it deprives the accused of the constitutional guaranty, that "in criminal prosecutions the accused shall have the right * * * to demand the nature and cause of the accusation." (Const., art. 2, sec. 22.) [Per SHERWOOD, C. J., BRACE and GANTT, J J.

2. **Criminal Law:** ATTEMPT. An attempt to commit a crime is cognizable in the place where made.

3. ——: ——: FRAUD. An attempt to obtain by fraud a check on which money could be obtained may be shown under an indictment which charges an attempt to obtain money.

*Appeal from St. Louis Criminal Court.*—HON. J. L. THOMAS, Judge.

REVERSED AND REMANDED.

*L. A. Steber* and *A. A. Paxson* for appellant.

(1) The form given in section 3826, Revised Statutes, 1889, under which this indictment is framed, must be declared unconstitutional. *State v. Clay,* 100

Mo. 571. The indictment does not follow the statutory form. (2) The indictment erroneously charges a number of separate and distinct offenses in one count, to-wit, "to cheat and defraud." *First.* By means and by use of false and fraudulent representation and statement. *Second.* By means and by use of a trick, a fraud, a deception, a confidence game. It does not individuate the offense. *State v. Flint,* 62 Mo. 393; *State v. Hayward,* 83 Mo. 299; *State v. Clay,* 100 Mo. 571. (3) The statute (sec. 3826) specifies three articles of value, money, property, valuable thing whatever. The indictment charges the attempt to obtain money. The proof, if it tends to show anything, shows that no money could have been obtained; only a draft, or warrant, or check, either of which would be "a valuable thing." This makes a fatal variance. *State v. Flint,* 62 Mo. 393; *State v. McChesney,* 90 Mo. 120; *State v. Horn,* 93 Mo. 191; *State v. Crooker,* 95 Mo. 389, 394; *State v. Clay,* 100 Mo. 571. (4) The money (if any) to be obtained was to be obtained in Maryland. The courts of Missouri can have no jurisdiction in this case. The crime (if any) was committed in Maryland. *State v. Schaeffer,* 89 Mo. 271; *State v. Lichliter,* 95 Mo. 402; 28 Am. L. Reg. (N. S.) 22, *et seq.,* article on locality in Criminal Jurisdiction; *Sims v. State,* 28 Tex. App. 447; *Commonwealth v. Gillespie,* 7 Serg. & Rawle, 469, 477–8; *In re Carr,* 28 Kan. 1; *Com. v. Harvey,* 8 Am. Jur. 69; Cooley on Constitutional Limitations [6 Ed.] p. 149; 1 Crim. Law Mag., pp. 695–698 (article by Francis Wharton).

*John M. Wood,* Attorney General, for the State.

(1) The constitutionality of section 3826, Revised Statutes of 1889, and the sufficiency of the form of indictment therein set out, have been frequently main-

tained by this court. *State v. Fancher*, 71 Mo. 460; *State v. Connelly*, 73 Mo. 235; *State v. Norton*, 76 Mo. 180; *State v. Williams*, 77 Mo. 310; *State v. Dennis*, 80 Mo. 589; *State v. Sarony*, 95 Mo. 349. (2) There is no merit in the point that the indictment alleges that the defendant attempted to obtain money, while the proof shows that had the offense been consummated he would have received a check. In charging an attempt, the pleader is necessarily governed by the obvious, apparent intent of the offender, and here surely his intent was to get the money, no matter in what form. (3) The result intended by the defendant was the obtaining of the $5,000, and the means employed by him were certainly adapted to that end. While the filing of the application for membership might be regarded as a mere preparation, the bogus initiation and what happened subsequently thereto are overt acts, and constitute an attempt. 1 Bishop on Criminal Law [7 Ed.] secs. 749, 750. (4) One may be punished for an attempt in the place where it is made, although the act may be consummated elsewhere. 1 Wharton on Criminal Law, sec. 289; 6 Crim. Law Mag., p. 173, and cases cited in the article. (5) The fact that the supreme council did not have the money in their treasury at the time of the attempt is immaterial under the decisions of this country. 1 Bishop on Criminal Law [6 Ed.] sec. 443, and cases cited.

SHERWOOD, C. J. — The defendant was jointly indicted with several other persons under the provisions of section 3826, Revised Statutes, 1889, which section is as follows: "Every person who, with intent to cheat and defraud, shall obtain or attempt to obtain from any other person or persons any money, property or valuable thing whatever, by means or by use of any trick or deception or false or fraudulent representation

or statement or pretense, or by any other means or instrument or device, commonly called 'the confidence game,' or by means or by use of any false or bogus check, or by any other written or printed or engraved instrument, or spurious coin or metal, shall be deemed guilty of a felony, and upon conviction be punished by imprisonment in the penitentiary for a term not exceeding seven years. In every indictment under this section it shall be deemed and held a sufficient description of the offense to charge that the accused did on ―――― unlawfully and feloniously obtain or attempt to obtain (as the case may be) from A B (here insert the name of the person defrauded) his or her money or property, by means and by use of a cheat or fraud, or trick or deception, or false and fraudulent representation or statement, or false pretense or confidence game, or false and bogus check or instrument, or coin or metal, as the case may be, contrary to the form of the statutes," etc.

This section is just like section 1561, Revised Statutes, 1879, with the exception that the duration of the punishment in the original section is fixed at not less than two years, while the amended section at not exceeding seven years.

The indictment in question is the following:

"STATE OF MISSOURI, ⎱  St. Louis Criminal Court,
"City of St. Louis.  ⎰      May Term, 1889.

"The grand jurors of the state of Missouri, within and for the body of the city of St. Louis, now here in court, duly impaneled, sworn and charged, upon their oath present that Robert Terry, Joseph Whitaker, Adolph Weber, August Koescher, David Goldberg and Annie Goldberg, alias Annie Hertz, late of the city of St. Louis aforesaid, and state aforesaid, on the sixteenth day of March, in the year of our Lord one

thousand eight hundred and eighty-eight, at the city of
St. Louis aforesaid, did unlawfully and feloniously,
with intent to cheat and defraud, attempt to obtain
from the supreme council of the United States Benev-
olent Fraternity of Baltimore City, a corporation duly
organized and existing under and by virtue of the laws
of the state of Maryland, the sum of $5,000, lawful
money of the United States, of the value of $5,000,
the property and money of the said corporation, the
supreme council of the United States Benevolent
Fraternity of Baltimore City, by means and by use of
a false and fraudulent representation and statement
and by means and by use of a trick, a fraud, a decep-
tion and confidence game. Contrary to the form of
the statute in such case made and provided and against
the peace and dignity of the state.

                    "ASHLEY C. CLOVER,
                        "Circuit Attorney."

A motion to quash this indictment as well as one
in arrest based on the insufficiency of the indictment
was denied.

The following is the substance of the testimony
elicited at the trial: The evidence in behalf of the
state developed the following facts: The supreme
council of the United States Benevolent Fraternity of
Baltimore is organized under the laws of the state of
Maryland, for the following purposes: to unite frater-
nally white male persons of certain ages, to establish a
fund for the relief of sick and distressed members and
the establishment of a benefit fund from which, under
certain circumstances, on the death of a member, a sum
of money was to be paid his family or to such person as
he might direct.

The principal office must always be located in the
city of Baltimore, and the order is authorized to carry

on its operations in each of the United States by the creation of subordinate councils.

The association has a grip, pass-words, regalia, secret initiation, etc., and a solemn obligation is imposed upon its members. The third object of the order, the payment of death benefits, is provided for by the establishment of five grades of membership, each paying different amounts upon death, and it is optional with the member as to which grade he shall join, it being merely a matter of expense. The money for the payment of these benefits is collected by the subordinate councils throughout the country from their members and transmitted to the supreme treasurer at Baltimore, where it is deposited. No money is kept by the local lodges for such purpose.

Upon the death of a member, the officers of his council forward the proofs of death to the supreme secretary, and thereupon he draws his warrant upon the supreme treasurer for the amount of the benefit and forwards the warrant to the secretary of the subordinate council, who delivers it to the beneficiary, taking therefor a receipt, which is sent to the supreme secretary. The only thing done by the beneficiary is the giving of this receipt. The proofs of death and necessary papers are prepared and forwarded by the officers of the local council. The warrant drawn by the grand secretary is negotiable in form, and can be collected either in Baltimore or at any local bank. The candidate for membership must be of the proper age, be recommended by a member, file a written application for membership, pass a satisfactory medical examination, pay an initiation fee and be initiated into a subordinate council.

In March, 1882, by virtue of the authority of the supreme council at Baltimore, George Washington Council, number 16, was organized in the city of

St. Louis as a subordinate council of the United States Benevolent Fraternity. Robert Terry, the defendant in this case, was chosen president or chief officer of this council in January, 1887, and Dr. Joseph Whitaker has been the medical examiner of the council since its organization.

Prior to the year 1887 there was living in the city of Dallas, Texas, a German by the name of Charles Ziefle. He was a widower without children, and his nearest relative was an only sister, a Mrs. Dora Schmidt, residing in the city of St. Louis. In appearance he was of medium height, slender build, with a small sandy mustache, light hair and quite bald on the front part of his head. By occupation he was a barber.

In the early part of 1887 Ziefle was induced to come to St. Louis by Robert Terry, the defendant, for the purpose of collecting part of a death benefit due him from a lodge of his deceased brother, Lorenz Ziefle. Upon his arrival in St. Louis he went to Terry's house, where he remained for quite a while on terms of intimacy with Terry. After leaving there he lived at various places for a while, among them his sister's, and finally, in the fall of 1887, he became a boarder in the house of Frederick Bothman. Here he lived, following his trade, until the beginning of the year 1888, when he was attacked by consumption, and so rapid were its ravages that by February, 1888, he could hardly leave his room or bed.

On the twenty-fifth day of February, 1888, at a meeting of George Washington Council, number 16, a written application for a fifth-grade membership, purporting to be signed by Charles Ziefle, was filed. The application stated that he resided at number 1123, North Thirteenth street, St. Louis, Missouri; that he was a barber by trade; and he directed, should he become a member, that at his death all benefits to

which he might be entitled should be paid his sister, Annie Hertz. The residence given was the home of David Goldberg, one of the defendants, and the Annie Hertz named as beneficiary is the sister of Goldberg, and also a codefendant. The applicant was recommended by the defendant Terry, the president of the council, and by Thomas Laird, its secretary. Mr. Laird, however, was not acquainted with Ziefle, and joined in the recommendation as a matter of form.

Accompanying this application was a physician's certificate signed by Dr. Joseph Whitaker, the medical examiner, and also a defendant. Dr. Whitaker stated therein that the applicant had signed the application in his presence, and that he had made a physical examination of Ziefle and had found that there was no evidence of disease of the organs of respiration or their appendages. He further stated that he regarded the character of the risk as good, and recommended him for membership.

Toward the end of February, 1888, Ziefle had become so ill that he insisted on being removed to a hospital; and, accordingly, on the first day of March, 1888, Mr. Bothman took him to the city hospital. At this time Ziefle was in the last stages of consumption, and his recovery an impossibility. He was emaciated to the last degree, being nothing but skin and bone, and he suffered from a constant cough and expectoration of blood. On the seventh day of March, 1888, the defendant Terry called at the house of the sister, Mrs. Schmidt, and told her that he had been to the hospital to see her brother, and that he was afraid Charley would soon be no more, as he was dying fast. He also said it was his intention to take Charley to the home of two ladies, near Tenth and Biddle streets, where he would receive kind treatment. When informed by Mrs. Schmidt that she proposed to remove

her brother to the Good Samaritan hospital, Terry insisted that if she did so she should have Dr. Whitaker wait upon her brother, so that he could be "built up." It was then agreed that Terry should meet Mrs. Schmidt at the city hospital on the following Sunday, March 11, 1888. Terry came to the hospital on that day in company with David Goldberg, and while at the bedside of Ziefle he again told Mrs. Schmidt of his desire to put Charley in the care of the two ladies on Biddle street. As they were leaving the hospital Mrs. Schmidt said to Terry, "What are you going to do with my brother?" He answered, "What are you going to do with him?" and when again told that she hoped to get him into the Good Samaritan hospital, he said, "I have the best claim on Charley Ziefle." This was the last time Mrs. Schmidt saw her brother alive.

The following afternoon, Monday, March 12, 1888, Terry and Goldberg took Ziefle from the hospital to the rooms of Mrs. Annie Hertz, situated on the third floor of the building, number 1227, North Tenth street, just a few doors north of Biddle. When brought to the house Ziefle was so weak that he was carried up stairs to Mrs. Hertz's apartments by Terry and Goldberg, and placed in bed. Here he remained until his death, never leaving the rooms until he was carried out a corpse. So weak was he during this time that, when on several occasions he fell out of his bed, he could not get into it again without assistance, nor was he able to feed himself. Terry visited him daily up to the time of his death, and Dr. Whitaker called to see him twice, and was the only physician who attended him. During the latter part of his illness, Ziefle repeatedly begged Mrs. Hertz to dress him and take him to his sister, Mrs. Schmidt, but without success. On the sixteenth day of March, 1888, a man calling himself Charles

Ziefle was initiated into membership in George Wash-·ington Council, number 16. Robert Terry, as president, conducted the initiation, and Dr. Whitaker was present at the meeting as medical examiner. The man initiated was apparently in good health and had a heavy dark brown mustache, and brown curly hair brushed down upon his forehead.

Although it was customary for newly-elected members to remain after the initiation so that they may become acquainted with their fellow-members, the person calling himself Charles Ziefle left immediately after he was initiated, and since that time has never been seen by any of the members of the lodge. At the same meeting David Goldberg was made a member, and immediately thereafter Dr. Whitaker proposed that Goldberg be elected secretary of the council, but the motion was defeated; this officer has the custody of all the records of the council, and carries on the correspondence with the supreme officers.

On the twentieth day of March, 1888, Terry called upon Mr. Laird, the financial secretary of the lodge, and told him that the new member, Ziefle, was quite ill; a few days later he called again, and said that Ziefle was worse, and that Dr. Joseph Whitaker was attending him; on this occasion he paid a lodge assessment for Ziefle that was not due until April.

On March 25, 1888, Mrs. Schmidt called at the city hospital and found that her brother was no longer there.

Early in the morning of March 27, it became apparent that Ziefle was dying; Mrs. Hertz went at once to notify her brother, Goldberg, and, in her absence, at about half-past seven o'clock, Charles Ziefle died, surrounded by strangers. About eleven o'clock Terry came to the house with two men, and they removed the body from the house, by the rear or alley way, to Benseick's undertaking establishment.

Later in the day Mr. Terry called on Mr. Benseick in company with a lady dressed in black and heavily veiled. This lady introduced herself as the sister of Charles Ziefle, and said that the funeral would take place from number 2620, Franklin avenue, the next day. Mr. Terry then called on Mr. Laird, told him of Ziefle's death, and requested him to notify the members of the lodge to attend the funeral; he said he had already notified Charley's sister, at Hermann, Missouri, and that she would be present.

At about eleven o'clock the same night August Koescher, a codefendant, living on the second floor of number 2620, Franklin avenue, was seen to go to the gate leading to the alley in the rear of his house and give a shrill whistle. In a few minutes Terry, accompanied by a man, drove up the alley with a wagon. A coffin was then taken from the wagon and carried by the three to Koescher's rooms; from the manner in which it was handled, it apparently contained a corpse.

The following day, March 28, at about one o'clock, Mrs. Hertz was seen to leave the rooms. She was dressed in black, and did not return until late in the evening.

At two o'clock the same day, the funeral took place from number 2620, Franklin avenue. Terry, David Goldberg and Dr. Whitaker were present with other lodge members, and seated at the head of the coffin was a woman dressed in black and heavily veiled, whom Terry introduced as Charley's sister. She exhibited great grief, crying bitterly, and when spoken to failed or refused to answer, nor did she at any time raise her veil.

Terry and the woman rode in the same carriage to the Holy Ghost cemetery, where the body was buried, and at the grave she showed the same signs of sorrow.

The burial certificate required by law was furnished by Dr. Whitaker, the attending physician, and it stated among other things that the deceased had died at number 2620, Franklin avenue, of pneumonia, and that by occupation he was a night-watchman. In the evening after the funeral Terry called on Mrs. Schmidt and told her that Charley was dead, and had been buried that afternoon; that it was Charley's wish that she should not hear of his death until he was buried, and he also told her that her brother was not a member of any lodge at the time of his death.

About April 6, 1888, the officers of the council prepared the proofs of the death of Ziefle and forwarded them to Baltimore. A part of these proofs was the certificate of Dr. Whitaker, as medical examiner of the council, and was sworn to by him. This recited that he had first seen his patient about the twenty-third of March, 1888, when he had only been sick a few hours; that the duration of his sickness had only been four days, and that the cause of his death was pneumonia. In the meantime Mrs. Schmidt ascertained where her brother was buried, and had the body exhumed, but was unable to identify it until a wig had been removed from the head.

These facts, becoming public, George Washington Council appointed a committee of investigation. This committee requested an explanation of Terry, and he first told them that Ziefle, who had died on Tenth street, and the one who was buried from Franklin avenue were different persons, but upon further questioning he refused to make any additional statement. When these facts became known, no assessment was made to pay Ziefle's death benefit, nor did Mrs. Hertz receive any money as his beneficiary

It was conceded that the United States Benevolent Fraternity had not been authorized by the insurance commissioners to do business in this state. The defendant offered no testimony.

The first point presented for determination is the constitutionality of the section on which the indictment at bar is bottomed.

I.   It is to be observed that there is no uncertainty as to the *intention* of the legislature in this regard; for the section expressly declares that: ''In every indictment under this section it shall be deemed and held a sufficient description of the offense to charge that the accused did, on ———, unlawfully and feloniously obtain or attempt to obtain (as the case may be), from A B (here insert the name of the person defrauded), his or her money or property, by means and by use of a cheat or fraud, or trick or deception, or false and fraudulent representation or statement, or false pretense, or confidence game, or false and bogus check or instrument, or coin or metal, as the case may be.''

Under these provisions it would doubtless be good simply to charge that the defendant obtained from the person defrauded, naming him, ''his or her money or property by means and by use of a cheat,'' without designating in any way whatever the sum of money, or the description of the property obtained, or of the means or of the cheat employed in the nefarious transaction.

And under the same provisions an indictment would, of course, be equally good, which should charge that the money, etc., was obtained by means and by use of a trick, or by means and by use of a false and bogus check.

When closely examined the section in question does not authorize in an indictment an *aggregation* of all the means mentioned, whereby money, etc., can be obtained; for toward the close of the section the sig-

nificant words are added "*as the case may be*," showing clearly that in the opinion of the legislature a charge in an indictment in the language of the statute of the employment of any one of the various means mentioned would be sufficient.

Section 22 of article 2 of our constitution, commonly called our bill of rights, declares that: "In criminal prosecutions the accused shall have the right * * * to demand the nature and cause of the accusation." The right to make such a demand is just as great, just as mandatory, as any other of the kindred rights grouped together in the same section of the constitution. So that the simple question is here presented: Does an indictment which follows the statutory form prescribed, and uses the precise language set forth in the section quoted, meet with the requirements of the constitution, though no allegation be made as to the amount of the money obtained, nor a description of the property, nor on whom the bogus check is drawn, nor to whom, nor where made payable, nor of what statements the false and fraudulent representation consisted? No lawyer would doubt for an instant that apart from statutory enactment the employment of such a form and of such general language in an indictment would be wholly insufficient to apprise the accused of the "nature and cause of the accusation" brought against him. See *State v. Evers*, 49 Mo. 542; *State v. Saunders*, 63 Mo. 482; *State v. Bonnell*, 46 Mo. 395.

The offense in this instance being a felony the defendant could only have been proceeded against by indictment. Const., art. 2, sec. 12. And an indictment means just what it did at common law. *Ex Parte Slater*, 72 Mo. 102.

The legislature may change it in *form*, but cannot change the *substance* of its material averments, without impinging upon constitutional guaranties. *State v.*

*Meyers,* 99 Mo. *loc. cit.* 116. See also as to the nature and cause of the accusation *State v. Arter,* 65 Mo. *loc. cit.* 655, 656; *State v. Stone,* 68 Mo. *loc. cit.* 104; *State v. Gabriel,* 88 Mo. *loc. cit.* 642.

Following the general language of the statute will not answer, only in those instances where *all* the *facts* which constitute the offense are *set forth* in the *statute itself,* which declares or announces or creates the offense. *State v. Kesslering,* 12 Mo. 565; *State v. Davis,* 70 Mo. 467.

SHAW, C. J., in *Tully v. Commonwealth,* 4 Metc. 358, observes: " When the statute punishes an offense, by its legal designation, without enumerating the acts which constitute it, then it is necessary to use the terms which technically charge the offense named at common law. * * * But we think this is not necessary when the statute describes the whole offense, and the indictment charges the crime in the words of the statute." Mr. Wharton, treating of this subject, says: " On the general principles of common-law pleading, it may be said that it is sufficient to frame the indictment in the words of the statute, in all cases where the statute so far individuates the offense that the offender has proper notice, from the mere adoption of the statutory terms, what the offense he is to be tried for really is. But in no other case is it sufficient to follow the words of the statute. It is no more allowable under a statutory charge to put the defendant on trial without specification of the offense than it would be under a common-law charge." Wharton on Criminal Pleading & Practice, sec. 220; to the same effect see Heard on Criminal Pleading, 161, 162, 163, 165, 166; *Stener v. State,* 17 Rep. 670; *State v. Gardner,* 28 Mo. 90; *State v. Rochforde,* 52 Mo. 199; *United States v. Carll,* 105 U. S. 611; *United States v. Cruikshank,* 92 U. S.

542; 1 Archbold on Criminal Practice & Pleading, 88; Hawk. P. C., ch. 25, sec. 111.

And BRETT, L. J., in *Bradlaugh v. The Queen*, E. L. R. 3 Q. B. D. 607, says: "Every pleading, civil or criminal, must contain allegations of the existence of all the facts necessary to support the charge or defense set up by such pleading."

Mr. Bishop, in his admirable treatise, says: "The doctrine of the courts is identical with that of reason, namely, that the indictment must contain an allegation of every fact which is legally essential to the punishment to be inflicted.    *    *    *    This doctrine pervades the entire adjudged law of criminal procedure. It is made apparent to our understandings, not by a single case only, but by all the cases.    Wherever we move in this department of our jurisprudence, we come in contact with it.    We can no more escape from it than from the atmosphere which surrounds us." 1 Bishop's Criminal Procedure, sec. 81.    And elsewhere the learned author observes: "The right of the accused person to have every element of his supposed crime—in other words, every individual thing which the law has specified as constituting any part of the foundation for its punishment—set down in allegation in the indictment is secured in this country by constitutional guaranties." "The United States constitution provides as to crimes against the general government that 'in all criminal prosecutions the accused shall enjoy the right    *    *    * to be informed of the nature and cause of the accusation.'    *    *    *    More or less nearly in these words are provisions in the constitutions of other states.    But the 'nature and cause' of an accusation are not stated where there is no mention of the full act or series of acts for which the punishment is to be inflicted.    *    *    * There can be neither indictment nor information except in writing, which to justify the whole punishment must

specify the whole crime." "Wisely, therefore, the law requires the allegation to be full. As already shown, every fact which is an element in a *prima facie* case of guilt must be stated; otherwise there will be at least one thing which the accused person is entitled to know whereof he is not informed, and, that he may be certain what each thing is, each must be charged expressly, and nothing left to intendment. All that is to be proved must be alleged." Secs. 86, 88, 519.

The same author says on this point in another place: "The indictment should be so far extended into detail, beyond the mere definition of the law on which it is drawn, as to render the particular instance of offending certain. * * * 'This certainly,' says Starkie, 'seems to consist in the special description of the persons, places and things mentioned in the indictment with their respective names, situation, extent, nature, quantity, number, value and ownership.'" Sec. 566.

"In mentioning things connected with the substance of the offense, the indictment should employ the word which denotes the species, not the generic term. For example, 'property' is too general, and so is 'cattle.'" Sec. 568.

On this point, PORTER, J., in *Mears v. Commonwealth*, 2 Grant's Cases (Pa.) 385, expresses his views very happily, saying: "In the spirit of that principle which presumes innocence until guilt be established, we infer that what is not charged in an indictment does not exist, and it is the business of the pleader to exclude by proper averments the conclusions to which the accused is thus entitled."

In *Commonwealth v. Phillips*, 16 Pick. 211, SHAW, C. J., observed: "The salutary rule of the common law, that no one shall be held to answer to an indictment or information, unless the crime with which it is

intended to charge him is expressed with reasonable precision, directness and fulness, that he may be fully prepared to meet, and if he can to answer and repel it, is recognized and enforced, and extended to every mode in which a citizen can be called to answer to any charge of crime in this commonwealth, by the highest authority known to the laws, namely, an express provision in the bill of rights, article 12. It declares that no subject shall be held to answer for any crime or offense, until the same is fully and plainly, substantially and formally, described to him. The reasonable degree of certainty required in an indictment is so familiar, that it requires no authorities to support or illustrate it. 1 Chitty's Criminal Law, 170. Whilst it is important to the administration of public justice, and the reasonable execution of the laws, that indulgence should not be too readily yielded to mere technical niceties and subtleties, it is also important that every man accused of crime should have a reasonable opportunity to know what the charge is, that he may not be called to meet evidence at the trial that he could not have anticipated from the charge, that the court may know what judgment to render, and that the party tried, and either acquitted or convicted, may be enabled, by reference to the record, to shield himself from any future prosecution for the same offense,"

Archbold says: "The indictment must state all the facts and circumstances comprised in the definition of the offense, by the rule of the common law or statute on which the indictment is founded. And these must be stated with clearness and certainty, otherwise the indictment will be bad. The principal rule as to the certainty required in the indictment may, I think, be correctly laid down thus: That where the definition of an offense, whether by a rule of the

common law or by statute, includes generic terms (as it necessarily must), it is not sufficient that the indictment should charge the offense in the same generic terms as in the definition, but it must state the species, it must descend to particulars." 1 Archbold on Criminal Practice & Pleading, 88. "Certainty may be defined to be a clear and distinct setting down of facts, so that they may be understood both by the party who is to answer the matters stated against him, the counsel who are to argue them, the jury who are to decide upon their existence, and the court who are the judges of the law arising out of them." *The King v. Griffith*, 3 Mod. 201; Lawes' Pleading, 53. In *United States v. Cruikshank, supra,* an indictment had been drawn which *"followed the language of the statute,"* and it was held bad, WAITE, C. J., stating: "In criminal cases, prosecuted under the laws of the United States, the accused has the constitutional right 'to be informed of the nature and cause of the accusation.' Amend. 6. In *United States v. Mills*, 7 Pet. 142, this was construed to mean, that the indictment must set forth the offense 'with clearness and all necessary certainty to apprise the accused of the crime with which he stands charged;' and in *United States v. Cook*, 17 Wall. 174, that 'every ingredient of which the offense is composed must be accurately and clearly alleged.' * * * For this, facts are to be stated, not conclusions of law alone." Similar rulings have been made elsewhere respecting the necessity of certainty in the charges contained in indictments based upon statutes when viewed in the light of similar constitutional provisions. *Landringham v. State*, 49 Ind. 186; *McLaughlin v. State*, 45 Ind. 338; *State v. Learned*, 47 Me. 426; *Murphy v. State*, 24 Miss. 590.

And acts of the legislature, whose purpose was to make a general allegation as to crimes charged in

indictments sufficient, were held unconstitutional, because of impinging upon the constitutional right of the accused to know of what he is alleged to be guilty, and to meet the exact charge against him.

And if the statute in this case, as it evidently does, authorizes the use of general terms in the indictment instead of those which are specific, those which state facts and so apprise the accused of what he has to defend, then the statute cannot stand the constitutional test as to the "nature and cause," etc.

The fact that the legislature has declared that vague and general terms shall answer in the place of specific statements does not help the matter; *for such an enactment is wholly beyond legislative power.* Judge COOLEY, when treating of the force and effect of that portion of a written constitution termed a "Bill of Rights," says: "Other clauses are sometimes added declaratory of the principles of morality and virtue; and it is also sometimes expressly declared—what indeed is implied without declaration—that *everything in the declaration of rights contained is excepted out of the general powers of government, and all laws contrary thereto shall be void.* * * * While they continue in force they are to remain absolute and unchangeable rules of action and decision." Cooley on Constitutional Limitations [6 Ed.] 48.

In the comparatively recent case of *State v. Crooker*, 95 Mo. 389, this statute was fully discussed, and there it was held, notwithstanding the statute in question, that there must be a specific description of the *property* obtained, and that the indictment must make a specific application of the terms of the statute to the case in hand.

It is true in that case that the observations and rulings were based for the most part on the failure to *describe* the *property* obtained, but a party accused has

an equal constitutional right to have the *means* described by which he obtained the property as he has to have the latter described; both are necessary to meet and fill the constitutional requirement respecting the "nature and cause." This seems too plain for argument taken even as [an original proposition and especially so, when considered in the light of the authorities already cited and quoted.

Where an indictment charges that certain property describing it, or that a certain sum of money, stating the amount, was obtained, etc., by means of the "*confidence game,*" and that term by long and common usage is well understood as meaning a particular kind of game played in a particular kind of way, this would possibly be sufficient where the facts in evidence would warrant the use of such a term, and this was so decided in *Morton v. People*, 47 Ill. 468.

If that case goes further than this it should not be followed. We attempted to follow it in *State v. Fancher*, 71 Mo. 460, in which case we went to very extravagant lengths in upholding the constitutionality of section 1561, Revised Statutes, 1879. We are now thoroughly satisfied that if that case is still to stand for law then section 22 of the bill of rights respecting the nature and cause, etc., must *fall*.

That case was, however, virtually overruled in *State v. Hayward*, 83 Mo. 299, and in *State v. Crooker, supra*. In the latter case, BRACE, J., speaking for the whole court, said: "We are now asked to go further in sustaining this indictment, which fails to give the defendant any information as to the particular act or acts, of the nature of those contained in the form prescribed that is complained of, or of any fact by which he could find out what act of his life, in connection with that of the injured party, he must prepare to defend. He may have had a hundred transactions with him or her,

prepare to defend one, and be confronted with evidence tending to prove him guilty of fraud in any one of the other ninety-nine. He may have prepared himself to defend a transaction in which he received money, and be confronted on the trial with evidence tending to prove that he had fraudulently obtained a farm, a horse, a boat or a buggy," etc. Utterances similar in effect to those just quoted are to be found in *State v. Butcher*, 47 N. W. Rep. 406.

The two latter *cases of Hayward and of Crooker* are absolutely incompatible in theory and principle with *Fancher's case*.

II. But if the statute is to be held to be constitutional then no valid objection can be urged against the indictment; because it is of a piece with the statute on which it is bottomed, and equally vague, uncertain and vexatiously indefinite.

III. It is unnecessary to rule the point now whether the "confidence game" used in the indictment at bar is sufficient because the facts disclosed of record show such an expression to be wholly inapplicable to those facts. And there can be no question but that on these facts the defendant when properly indicted can be made to suffer for the crime committed.

IV. The charge in the case at bar is not of a consummated crime, but of an attempt to commit the crime. Such attempts are cognizable in the place where made. 1 Wharton on Criminal Law [9 Ed.] secs. 195, 288. The venue of the offense was, therefore, properly laid as being within this state.

V. The point is made that the indictment charges that defendant attempted to obtain the *money*, but that the proof shows that had the offense been consummated he would not have received any money, but merely a *check*. There is no force in this contention because the *attempt* is the *gravamen* of the charge, and the fact that

the result of the completed crime would only have been a *check*, upon which the money could have been obtained, cuts no figure in the case and has no ten-dency to disprove the fact of the attempt having been made.

The judgment should be reversed, and the cause remanded. BRACE and GANTT, JJ., concur in all that is said; MACFARLANE, J., in reversing and remanding and will file a separate opinion; BLACK and THOMAS, JJ., hold the judgment should be affirmed, and, therefore, dissent; and BARCLAY, J., is absent.

### SEPARATE OPINION.

MACFARLANE, J.—I am unable to agree that so much of section 1561, as undertakes to provide a form of indictment, is unconstitutional. When such of the words of the statute are used as individuate the means adopted for the accomplishment of the fraud, I think the accused is fairly advised of the nature and cause of the accusation against him. When one is told that on a particular time, in a specified county, he unlawfully and feloniously obtained from a person named $10 in money, by means and by use of any one of the particular methods or instrumentalities named in the statutory form, he has fuller and more specific information of the accusation against him than one accused of larceny has under a common-law indict-ment for that offense. He has the advantage of knowing that he is charged with perpetrating or attempting to perpetrate the fraud in a particular manner or by the use of a particular instrument, which information is not given one under an indict-ment for larceny.

It is held that an indictment charging a statutory offense in the language of the statute is good when "the

statute so far individuates the offense that the offender has proper notice from the mere adoption of the statutory terms what the offense he is to be tried for really is." Wharton on Criminal Pleading & Practice, sec. 220; *State v. James*, 37 Mo. App. 216, and cases cited; *State v. Hayward*, 83 Mo. 304, and the opinion of SHERWOOD, C. J., in this case.

The statute does, in my opinion, sufficiently individuate that element of the offense which consists in adopting certain means or instrumentalities in effecting the fraud when it uses the words "confidence game," "false and bogus check," "false or bogus coin or metal." The means by which the fraud must be accomplished is not, in my opinion, sufficiently individualized by the use of the generic terms and words "cheat," "trick," "deception," "false and fraudulent representation or statement" or "false pretenses." The statute, in the use of the words, "as the case may be," implies that such of these means and instrumentalities may be charged in the indictment as a proper averment of the offense may require; the rest, when used, can be rejected as surplusage.

It has been well said that, "When courts are called upon to pronounce the invalidity of an act of the legislature, passed with all the forms and ceremonies requisite to give it force, they always approach the question with great caution, * * * and never declare a statute void, unless, in their judgment, its nullity and invalidity are placed beyond a reasonable doubt." *State ex rel. v. Railroad*, 48 Mo. 468; *State v. Able*, 65 Mo. 362; *State ex rel. v. Laughlin*, 75 Mo. 147; *State v. Hope*, 100 Mo. 352.

This act was declared to be constitutional in the year 1880, in the *Fancher case*, 71 Mo. 460, and has been expressly and repeatedly approved by many sub-

sequent decisions. *State v. McChesney*, 90 Mo. 120; *State v. Horn*, 93 Mo. 190; *State v. Beaucleigh*, 92 Mo. 490; *State v. Sarony*, 95 Mo. 349.

I take it that proper regard for a co-ordinate branch of the government and for the constitution itself, which defines the powers of both the legislature and judiciary, require us to hold this enactment valid and constitutional if any single description of the means used is sufficiently specific to fairly apprise the accused of the charges against him.

I am of the opinion that all of those words or terms used in the statute which point to some specific act or instrument as means used or attempted sufficiently point out and advise the accused of the particular manner in which he is charged with offending, and when any one of them is used the indictment, on its face, is valid.

I am of the opinion that this indictment, in charging the defendant with attempting the fraud by means of the "confidence game," is sufficient on its face to charge the statutory offense. The term, "confidence game," by its common use, has acquired a meaning well and definitely known and understood. It is defined: "Any swindling operation in which advantage is taken of the confidence reposed by the victim." Webster's International Dictionary.

While the schemes and devices for carrying out these frauds, commonly known as "the confidence game," are as varied as the mind of man is ingenious, one essential element of the swindle consists in obtaining the confidence of the victim, and then fleecing or robbing him. This element gives name and character to the fraud.

The language of the statute defining the offense is used, and the words employed sufficiently indicate the

means used.  *State v. Fancher*, 71 Mo. 460, and cases cited; *Morton v. People*, 47 Ill. 468; 10 American & English Encyclopedia of Law, 566, and note.

The evidence in this case fails to prove an attempted fraud by means of the "confidence game," as commonly known and understood.  The fraud was attempted by means of false and fraudulent representations, statements and pretenses, and the indictment should have stated so much of the details as would have rendered the particular representations, etc., certain.  I am, therefore, of the opinion that the case should be reversed and remanded.