THE STATE v. BENSON, *Appellant.*

Division Two, March 28, 1892.

1. **Criminal Law:** FALSE PRETENSES. In a trial for obtaining hay under false pretenses it appeared that the defendant falsely told the seller of the hay that he owned several barns and was in partnership

with a certain person, and that he paid for the hay with his individual check, payment of which was refused by the bank. The seller testified that he relied upon the simple fact of the statement as to the partnership. The evidence further showed that the contract for the sale was not consummated until several days after the statements were made, that the seller expected to be paid on the delivery of the hay, and that the defendant afterwards paid the seller all the money he had and turned all his property over to his creditors. *Held,* that the evidence was not sufficient to sustain a conviction.

2.   **False Pretenses:** INDICTMENT: CONSTITUTION. An indictment which charges the defendant with having feloniously obtained property "by means of and by use of a cheat, fraud, trick, deception, false and fraudulent representation and statement, and false pretenses," is not sufficiently explicit as to the means used to inform the accused of the accusation against him as required by the constitution, article 2, section 22. *(State v. Terry,* 109 Mo. 601 *followed).*

*Appeal from Barton Circuit Court.* — HON. D. P. STRATTON, Judge.

REVERSED.

*John M. Wood,* Attorney General, for the State.

THOMAS, J.—The defendant was found guilty of obtaining property under false pretenses, and sentenced therefor to imprisonment in the penitentiary for two years, by the circuit court of Barton county, in February, 1890, and he prosecutes this appeal.

We think the court committed error in overruling defendant's demurrer to the evidence, which he interposed no less than three times during the trial. We are loath to interfere with the finding of a jury in a case of this character, but when we have an abiding conviction that the accused has committed no crime we feel it to be our imperative duty to say so. Humanity revolts at the punishment of the innocent. It has been justly said that it is better that nine and ninety guilty men escape than that one innocent man should suffer.

A careful and attentive study of the facts disclosed by this record convinces us that defendant committed no crime. This case sharply illustrates the statement of Robert Burns, that

> Man's inhumanity to man,
> Makes countless thousands mourn.

Defendant was torn from his wife and child, incarcerated in jail, and finally sentenced to imprisonment in the penitentiary for no higher crime, in our opinion, than being poor, failing in business, and being unable to pay his debts.

About the first of August, 1889, defendant went to Cyrus Dickson's in Barton county to buy hay. He was a stranger to Dickson, and being introduced to him as a hay dealer the latter asked him where he was doing business, and the evidence tends to show that he replied that "he was living in Girard and owned a barn there, and one at Litchfield and one at Medway and one at Pittsburg, and was a partner of King's at Arcadia." Defendant denies however that he made that statement. He and Dickson went out and looked at some hay in the field. Dickson asked $7.50 a ton for the hay, defendant offered $7.25, and not coming to terms the purchase was not made. This was on Friday. The next Monday a man by the name of Northington went to Dickson and told him he had come to buy hay for defendant. They agreed on $7.35 per ton for it, and the purchase was made, the hay, then in stacks, to be baled and put in the cars at Ellsworth by Dickson. The hay was baled and hauled to Ellsworth during the month of August and shipped by defendant to Goddard & Hall at New Orleans. After the hay was delivered, defendant signed a check, in blank, on the First National Bank of Girard, and gave it to Northington to fill up for the proper amount in payment for it, there being about forty-nine tons of it; $20

in cash was paid by Northington, and the check was filled up for $341.10 and delivered to Dickson, but afterwards went to protest.   Dickson met defendant on the sixth or seventh of September and asked him why the check had not been paid, and he replied that he had not received the returns from his hay, and that he had no money.   Dickson said it was hard he and his boys should work all summer and not get pay for their hay.   Defendant thereupon gave Dickson a check for $125 on the same bank, signed by his wife, which was paid.   The balance of the check of $341.10 was never paid.

Dickson testified as follows:   " *Q*.   You stated to the jury about the statements of Benson about the barns and as being in partnership with King—now tell the jury whether you relied on those statements as being true and let him have the hay?   State what, if anything, what effect did the conversation have on your mind?   *A*.   It had just enough effect on my mind to get my hay.   *I relied upon him* from the simple fact that he was the partner of Mr. King, being close, not far away, twelve and one-fifth miles; stating that *he was a partner of King made me trust him more than all the barns*.   I had frequently heard of Mr. King, had heard of him, I knew of him.

· " *Q*.   State what effect, if anything, Benson's statement had on your mind, any effect on your delivering the hay at Ellsworth?   *A*.   I expected my money.

" *Q*.   What effect did these statements about the barns and Mr. King have on you?   *A*.   It had the effect of causing me to take my hay over there."

There was evidence tending to prove that at the time of the purchase of this hay defendant was not engaged in shipping hay from any point except Ellsworth and Barton; that he owned no barns except

one owned jointly by him and King at Arcadia, and that he and King were not partners in the hay business. It also appeared that the barn at Arcadia was held by defendant's trustee for the benefit of some of his creditors. The evidence showed that defendant lived at Girard, had a wife and one child, had been engaged in buying and shipping hay for two years, and had owned barns at and shipped hay from Medway, Litchfield and Pittsburg.

It will be observed that the question whether Dickson relied on defendant's alleged false statements presents one of the most material issues involved in the case. Dickson says he was deceived by them, and parted with his property because he relied on them. We wish to examine his testimony on this point in the light of the other evidence. Here is a statement of Dickson's *mental* condition. That *mental* condition must have existed at the time of the purchase of the hay, and upon the proof or non-proof of its existence at *that time* the liberty of one citizen and the reputation of one family hang. There is no proof of this except Dickson's statement. Who is Dickson? He is a farmer living in Barton county. He told the defendant he would spend twice as much as the hay was worth to catch him, and would do all he could to send him to the penitentiary, if he did not pay him for the hay, and hired a lawyer to prosecute the case. He was on the grand jury that preferred the bill of indictment against defendant, who was then in jail. Besides that, it clearly appeared in evidence that, in baling, the weather-beaten hay at the top and the molded hay at the bottom of the stacks was baled and shipped with the good hay, and only two wires put on about half the bales, when there ought to have been three wires. These two facts, *i. e.*, the baling of inferior hay and shipping it with the good, and putting only two wires on the bales,

caused a loss to defendant on this lot of hay in the New Orleans market of $250, the hay not netting enough by over $100 to pay the amount due Dickson. In other words instead of making a profit on the hay, as he expected and had a right to expect to do, he actually lost over $100 on the original cost, resulting from Dickson's negligence in baling it.

We state these facts to show how much weight Mr. Dickson's testimony is entitled to, when he is permitted to draw *on his imagination* for influences that operated on his mind, at the time of the delivery of the hay. He said he was prosecuting defendant for the public good. We think he prostituted the administration of the law when he remained on the grand jury, and voted to indict the man whom he was prosecuting for a crime alleged to have been perpetrated against him. When the grand jury was impaneled, if he had stated to the court his relation to this case, and asked to be excused from service, he would stand before this court upon a much higher plane than he does now, as an exemplar of moral rectitude, and the corrector of the evils of society. It is an ancient and wholesome maxim that no man should be a judge in his own case.

But let us inquire and see if Mr. Dickson was in fact deceived by the statements of defendant that he had barns at several places, and was a partner of Mr. King at Arcadia. He and defendant could not and did not agree on the price of the hay Friday evening. The defendant did not ask for credit. The statements were not made to obtain credit. They were made incidentally in answer to a question where he was doing business. If there is a particle of evidence or any inference to be drawn from the evidence, that defendant expected Dickson to credit him for the hay on those statements, we have not been able to find it in this record. Defendant was a stranger to Dickson,

and so was King, except that Dickson knew King by reputation. It would require a wide stretch of the imagination to believe that Dickson trusted defendant solely on the ground, that he could make him pay by law. He made no inquiry as to the value of the barns defendant said he owned.

It is a little remarkable that defendant should be on a mission to cheat and defraud Dickson, and then stand on twenty-five cents per ton for the hay. What difference would it have made to defendant, whether he agreed to pay $7.50 or $7.25 per ton, if he did not intend and expect to pay anything? He left without making the purchase. The next Monday, Northington, as defendant's agent, bought the hay at $7.35 per ton. In making this sale did Dickson rely on defendant's statements about the barns and being a partner of King? Let us see. Here is what Dickson says about it:

" Q.  State what you did with your hay; answer my question?  A.  I sold it to Mr. Northington.

" Q.  What did you do with that hay after that? A.  I had it baled and delivered at Ellsworth to Mr. Northington."

On cross-examination, speaking of the sale of the hay to defendant, he testified:  " Q. But you said you did not sell it to Benson?  A.  I guess I did.

"Q.  You say you sold this hay to Northington? A.  Yes, sir; I sold the hay to Northington.

"Q.  Then these checks you are talking about, and that order you are talking about, was not in consequence of any sale you made to Benson, with any contract you had with Benson?  A.  Benson?

"Q.  You know whether or not, say yes or no. A.  I suppose it was in one sense of the word.

"Q.  Was it in fact.  A.  I think it was in fact."

This was his evidence when first on the witness stand.  Being recalled at a subsequent stage of the

trial and after there had been considerable discussion among the attorneys before the court in regard to whether the sale of the hay was to Northington or defendant, he said: "*Q.* Detail the conversation between you and Northington; what he said, who he was buying the hay for; go on and state. *A.* As I said he came over on Monday morning and said—

"*Q.* What morning, when? *A.* After the Friday, after Benson had been there on Friday, and said that Benson had sent him there to buy my hay and said he would give me $7.35 a ton for it. I sold it to him.

"*Q. State all that was said as you can recall it? A.* I sold it to him for $7.35. * * * That's al there was to it. Benson was to have the hay."

On cross-examination he said: "*Q. That is all the contract you had for the sale of the hay? A. Yes, sir; that's all.*"

The testimony shows that Dickson did not rely on defendant's statements about the barns. Here is his exact language: "I relied upon him from the simple fact that he was a partner of Mr. King being close, not far away, twelve and one-fifth miles; *stating he was a partner of King made me trust him more than all the barns.*" Here is an explicit declaration that it was the statement of defendant's connection with King, that deceived Dickson, and not the statement about the barns. At the time Northington closed the contract for the purchase of the hay not a word was said about King, and yet Dickson now pretends that he parted with his hay on the faith of the partnership of defendant and King. Dickson's own testimony clearly and unequivocally negatives his reliance on the statement that King was defendant's partner in the purchase of the hay because he positively swears that Northington bought

the hay *for defendant*, and he afterwards took *defendant's check* for the hay, without inquiring why King's name also was not to it.

Defendant being a stranger, why did not Dickson ask Northington, who he was, the extent of his business and the amount of his property? Dickson did not even ask Northington who was to pay for the hay, or when it would be paid for. No credit was asked or given. Dickson was engaged in delivering the hay at Ellsworth for several weeks, and during all that period he made no inquiry as to the extent of defendant's business, or the amount of his property, or whether King was his partner. It is manifest to us that the plea that Dickson relied on defendant's statements as to the barns and the King partnership was an afterthought. At the time the hay was bought both parties supposed it would be paid for when it was all delivered. Taking, therefore, Dickson's testimony in the strongest light it can be viewed, we feel perfectly satisfied that defendant did not make the statements to deceive anyone, nor were the statements he made, in the connection in which they were made, calculated to deceive, nor did they deceive, Dickson. Nor were they wholly false. Defendant had been shipping hay from the points, he named, and he had owned barns at those points, but had sold them. He and King did own a barn at Arcadia. King was not, however, defendant's partner in buying and shipping hay, but as Dickson did not trust King as a partner of defendant, as we have shown, this statement is immaterial. We would refuse, in a suit in equity, to set aside the sale of this hay on the ground of fraud, and much less can we afford to let a conviction for a felony stand upon the facts disclosed by this record. Indeed, if Dickson was suing for the balance of his check, and defendant should set up by way of recoupment the damages he had sustained by

reason of the negligent baling of the hay, we think the evidence would justify a verdict for defendant, and, therefore, the defendant justly owes Dickson nothing.

But this is not the whole case. The evidence shows further that defendant was engaged in buying hay and shipping it to New Orleans, Memphis, Galveston and other points. When he shipped hay he drew on the consignees for about two-thirds of what it was supposed to be worth in the market to which it was sent, in favor of the First National Bank of Girard, Kansas, where he did business, and then would draw checks on this bank in favor of the parties, from whom he bought hay, in payment for the same. The testimony of the cashier of this bank shows that defendant drew drafts on the consignees of hay as follows: August 14, on Goddard & Hall, $90; August 19, on Flake, Galveston, $100; August 20, on Goddard & Hall, $100; August 23, on Goddard & Hall, $200; August 26, on Goddard & Hall, $90; August 31, on Goddard & Hall, $75; September 4, on Goddard & Hall, $60, and on Mullaly (St. Louis), $70. Of these the following were returned not paid: Flake, $100, and the drafts on Goddard & Hall of August 23, $200; August 26, $90; August 29, $90; August 31, $75; September 4, $60, and the draft on Mullaly, $70. The check of $341.10, given by defendant in payment for the Dickson hay, was dated August 30. On August 29, defendant informed the cashier of the bank at Girard, that he was surety on some notes and he feared the holders of those notes would seek to get the money in the bank, which would render him unable to pay for the hay he had bought, and thus his business would be destroyed so that he could not pay anybody, and asked the cashier's advice what to do. The cashier advised him to keep the account in his wife's name. Defendant took the advice and transferred his account

to his wife, with orders to deposit the money received from the sales of hay in her name. So, it seems, on the day the check to Dickson was dated, no money was in the bank to the credit of defendant, but we think this was satisfactorily explained by defendant. He said he had given the blank check to Northington to fill out for the Dickson hay some day or two before the transfer to his wife was made, and when Dickson went to defendant personally and inquired about the check, the defendant had his wife give Dickson a check for .$125, which substantially covered all there was in the bank to her credit at that time.

The evidence shows further that every dollar the defendant and his wife had was paid out to his creditors, and that when defendant told Dickson he had no money to pay him Dickson requested him to give, and he did give, him drafts on the consignees of the hay, but these were not paid. In addition to this defendant entered into a written agreement with Dickson and his other creditors that the proceeds of the sales of the hay should be paid by the bank on their claim. That the bank account was kept in the name of defendant's wife after August 29, for the honest purpose of paying for the hay he was buying in the neighborhood, is clearly proved from the fact that all the money that went to her credit was so applied. The defendant and his wife swear that this was their purpose, and the cashier of the bank corroborates them in this. Hence, it seems, that defendant, instead of intending to cheat the parties who sold him hay, actually took steps to prefer them, and to protect his business by paying them. The first interview defendant had with Dickson, after their meeting on the Friday evening before the hay was purchased, was about the sixth or seventh of September. There had been drawn prior to that time $450 of drafts on the consignees of hay, which were returned

not paid.   Defendant was broken up at this time.   He evidently had no capital at any time, for his wife worked in a kitchen as a servant, and when these drafts were not paid he had not a dollar left.   He was hustled off to jail, and thus his opportunity to make money was gone, and he now prosecutes this appeal as a poor person.   It seems he had no business capacity, for he bought the hay of Dickson and paid no further attention to baling it, and it was so negligently baled that he lost heavily on that lot, and the probability is his dealing with others was of an equally unbusiness-like character.   It does not take many such transactions as this Dickson transaction to financially swamp a man, especially a poor man.   The defendant made shipwreck of his business.   He proceeded in a loose way.   He was improvident.   But improvidence is no crime.   He bought the hay expecting to be able to pay for it when delivered, and if his business had prospered as he anticipated, he would have paid for it.   Hay badly baled and damaged was sent to market, and of course was sacrificed.   When his creditors came upon him he paid out all he had, and then he was sent to jail because he had nothing more to pay with.   This record discloses the same old story of a hardhearted, merciless creditor on one side, and a helpless, unfortunate debtor on the other.   A Shylock always presses his victim,

> Unmindful tho' a weeping wife
> And helpless offspring mourn.

If the defendant can be convicted of a felony on the facts of this case, then no man who engages in business and fails is safe.

II.   The indictment in this case is drawn under section 3826, Revised Statutes, 1889, and charges that defendant and John Northington feloniously obtained from Cyrus Dickson forty-nine tons of hay "by means

of and by use of cheat, fraud, trick, deception, false and fraudulent representation and statement and false pretense," with intent him, the said Cyrus Dickson, to cheat and defraud. Since writing the foregoing opinion the supreme court sitting *in banc* has, in the case of *State v. Terry*, 109 Mo. 601, determined and held that the specification in this indictment of the means, by which the alleged crime was committed, is not sufficiently explicit and definite to inform the accused of the nature and cause of the accusation against him, within the meaning of section 22 of our bill of rights. The writer of this did not, and does not now, concur in that ruling, but it is controlling authority, and for this defect in the indictment as well as the insufficiency of the evidence to support the verdict the judgment will have to be reversed, which is accordingly done, and the defendant is discharged. All concur.